**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. 05-CR-77-LRR |
| vs. | ‖ | **SENTENCING** |
| | ‖ | **MEMORANDUM** |
| DEMONT CORTEZ BOWIE, | ‖ | |
| Defendant. | ‖ | |

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

*III.*   *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

*IV.*   *THREE STEP PROCESS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

*V.*    *SENTENCING CALCULATIONS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *A.*   *Non-Disputed Issues* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *B.*   *Disputed Issues* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
           *1.*   *USSG §2A3.1(b)(1) and use of force* . . . . . . . . . . . . . . . . . . **8**
           *2.*   *Application of both USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5) does not constitute impermissible double counting* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
           *3.*   *Defendant's motions for downward departure* . . . . . . . . . . . **15**
                *a.*   *Downward departures are disfavored* . . . . . . . . . . . **15**
                *b.*   *Downward departure for overstated criminal history* . . **17**
                *c.*   *Downward departure for abusive relationship with father* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
           *4.*   *Section 3553(a) factors* . . . . . . . . . . . . . . . . . . . . . . . . . **19**
           *5.*   *"Life" is equivalent to 470 months* . . . . . . . . . . . . . . . . . **24**

*VI.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

## I.  INTRODUCTION

In this sentencing, the court decided a number of important legal issues.  In calculating Defendant Demont Cortez Bowie's advisory Sentencing Guidelines range,[1] the court decided:  (1) whether Defendant's offense level should be increased by four levels pursuant to USSG §2A3.1(b)(1) for the use of force in kidnapping M.B. and (2) whether upward adjustments under both USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5) constitutes impermissible double counting.  The court considered whether a downward departure was warranted due to Defendant's criminal history or his abusive relationship with his father.  Finally, the court considered the factors in 18 U.S.C. § 3553(a) and sentenced Defendant.[2]

---

[1]    Although application of the Sentencing Guidelines is no longer mandatory, [in the Eighth Circuit] district courts are still required to consult the Guidelines and take them into account in calculating a defendant's sentence. A district court must calculate a defendant's advisory Guidelines sentencing range based on his total offense level, criminal history category, and any appropriate departures. The court may also vary from the advisory Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a) as long as the resulting sentence is reasonable. Proper application of the Guidelines "remains the critical starting point" for fashioning a reasonable sentence under § 3553(a), and a sentence within the properly calculated Guidelines range is presumed to be reasonable.

*United States v. Jeremiah*, 446 F.3d 805, 807 (8th Cir. 2006) (citing, in part, *United States v. Booker*, 543 U.S. 220, 264 (2005)).

[2]    Originally, the government moved for upward departures pursuant to USSG §4A1.3 for understated criminal history; pursuant to USSG §5K2.0(a)(3) based upon circumstances present to a degree not adequately taken into consideration; and pursuant to USSG §5K2.8 for extreme conduct.  At the sentencing hearing, the government withdrew its motions for upward departure.  Instead, it argued for a sentence within the advisory sentencing guideline range.

## II. PROCEDURAL BACKGROUND

On September 7, 2005, a grand jury charged Defendant in a one-count Indictment. On October 5, 2005, a grand jury charged Defendant in a six-count Superseding Indictment.

On January 6, 2006, the parties entered into a plea agreement ("Plea Agreement"). On that same date, Defendant appeared before Chief Magistrate Judge John A. Jarvey and pled guilty to Count 1 of the Superceding Indictment. Count 1 charged that, on or about March 18, 2005, Defendant willfully and unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted and carried away a person, M.B., who had not obtained the age of eighteen years, and willfully transported her in interstate commerce from St. Paul, Minnesota, to the Northern District of Iowa, and held her for the purposes of ransom, reward, prostitution, sexual activity, and compelled service for his benefit, in violation of 18 U.S.C. § 1201. On January 23, 2006, the undersigned accepted Defendant's guilty plea.

On June 7, 2006, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR"). On July 17, 2006, the USPO revised the PSIR. On August 31, 2006, the government and Defendant filed their respective sentencing memoranda and Defendant filed a Motion for Downward Departure or Variance.

On September 14, 2006, Defendant appeared at a sentencing hearing ("Hearing") before the undersigned. Assistant United States Attorney C.J. Williams represented the government. Defendant was personally present and represented by Attorney Leon Spies. At the conclusion of the Hearing, the court pronounced sentence in a manner consistent with the instant Sentencing Memorandum.

## III. FACTS

The parties stipulated to the following facts in the plea agreement (docket no. 39):

> On about March 17, 2005, [Defendant] met the victim, M.B., in Minneapolis, Minnesota. M.B. was a 13 year-old runaway. Defendant was in Minneapolis with his girlfriend, Toni Debler, to visit [Defendant's] family and friends, having driven to Minneapolis from Debler's house in Wellman, Iowa, in Debler's van. When [Defendant] met M.B., he told her that she was going with him. While in Minneapolis, M.B. perform (sic) oral sex on him. Defendant spent part of the night of March 17, 2005, in Debler's van with M.B.
>
> Shortly after arriving in Minneapolis, it was discovered that Debler's van was not working and it was taken to a mechanic to get it fixed. The mechanic agreed to discount the price of repairs in exchange for sex with M.B. The mechanic left with M.B., engaged in sexual intercourse with her, then returned to the garage.
>
> Defendant, M.B., Debler, and [Defendant's] uncle, Chris Salis, then drove around the twin cities of Minneapolis and St. Paul for a period of time together. At some point during this drive, [Defendant] physically slapped M.B., intimidating and frightening her.
>
> Ultimately, the van was driven to the Tyreece Freeman's (sic) residence where Freeman joined the group in the van. Chris Salis was thereafter dropped off and instructed the occupants of the van how to get back to the freeway and enroute to Iowa. At that point, the group began their trip to Debler's house in Wellman, Iowa. Debler drove the van, [Defendant] sat in the front passenger seat, and Tyreece Freeman and M.B. sat in the back of the van. During the trip from Minneapolis, through the Northern District of Iowa, to Wellman, Iowa, [Defendant] consented to M.B. performing oral sex on Freeman in exchange for $20.00. The money was ultimately given to [Defendant]. M.B. was taken from Minnesota to Iowa against

her will and out of fear and intimidation.

Shortly after the group arrived in Wellman, Iowa, [Defendant] took M.B. to the house of an acquaintance, Paul Nisley. At Nisley's house, M.B. performed oral sex on him ([Defendant]), and also performed oral sex on Paul Nisley, during which Nisley shared cocaine with Defendant.

On or about March 19, 2005, [Defendant] had two friends, Isaac Reed and Michelle Roe, stay over night with him in Debler's home. While there, [Defendant] told M.B. to perform oral sex on him ([Defendant]). Tyreece Freeman asked [Defendant] if M.B. could perform oral sex on him, and [Defendant] consented.

Over the course of time M.B. was in Wellman, she engaged in sexual conduct with Paul Nisley, and performed sex acts on [Defendant].

At the time [Defendant] knowingly and willfully abducted M.B. from Minneapolis[, he] took her across state lines to Iowa for the purpose of engaging in sexual activity with her.

On Easter Sunday, March 27, 2005, [Defendant] took M.B. to the home of his father, Robert Salis, Sr., in Williamsburg, Iowa. While there, [Defendant] got into a physical fight with his father and fled from the residence when police officers were called there by neighbors. Defendant's father, Robert Salis[,] Sr., would not allow M.B. to leave his residence.

From March 28, 2005, until about mid-April 2005, Robert Salis, Sr., together with his girlfriend, Betty Thompson, employed M.B. in prostitution in North East Iowa, including Cedar Rapids, Iowa.

Defendant took M.B. from Minnesota to Iowa against her will for the purpose of engaging in sexual activity with her for his own personal gain. While en route to Iowa, and while in Iowa, M.B. engaged in sexual conduct with others with

> [Defendant's] consent. During this conduct[,] money and
> drugs were shared or exchanged.

(docket no. 39 at ¶29(A)-(K)). Defendant admits additional facts in the PSIR:

> On or about March 25, 2005, [Defendant] took M.B. to the
> Nisley home where they met with Nisley and another young
> woman named Stephanie Workman. While in the Nisley
> home, Nisley or [Defendant] provided a controlled substance,
> believed to be heroin, to Workman and M.B. Workman began
> to overdose on the drug. Regardless, Defendant engaged in
> sexual intercourse with Workman and compelled M.B. to
> engage in sexual conduct with Workman as well. Ultimately,
> [Defendant] left . . . Nisley's home. Later that night an
> ambulance was called and Workman was taken to the hospital.
> Hospital laboratory reports confirm that Workman had large
> quantities of heroin in her system. Workman recovered from
> the overdose.

(PSIR ¶ 25).

## IV.  THREE STEP PROCESS

The Eighth Circuit Court of Appeals has explained that, in the post-*Booker* world,
"there are essentially three steps to determining an appropriate sentence." *United States
v. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006).

> First, the district court should determine the applicable
> Sentencing Guidelines range without consideration of any
> Guidelines departure factors, because the Guidelines remain an
> important sentencing factor. *See* § 3553(a)(4). Second, the
> district court, where appropriate, should consider the departure
> provisions contained in Chapter 5, Part K and/or §4A1.3 of
> the Guidelines, as those sentencing provisions have not been
> excised by *Booker*. The resulting range is the post-*Booker*
> advisory Guidelines range. Third, the district court should
> consider the rest of the § 3553(a) factors in determining
> whether to impose the "Guidelines sentence" as determined in
> the prior steps or a "non-Guidelines sentence" driven by the

> other § 3553(a) considerations, and sentence the defendant
> accordingly. [*United States v.*] *Haack*, 403 F.3d [997,] 1003
> [(8th Cir.), *cert denied*, 126 S. Ct. 276 (2005)]; *see also*
> *United States v. Denton*, 434 F.3d 1104, 1114 (8th Cir.2006)
> (reviewing the sentence imposed by the district court under the
> three-part *Haack* methodology).

*Id.* at 934-35. Here, the court determined the applicable Sentencing Guidelines range. Then, the court considered the departure provisions and Defendant's motions for downward departure. Finally, the court considered each of the factors in § 3553(a) and sentenced Defendant.

## V. SENTENCING CALCULATIONS

### A. Non-Disputed Issues

The applicable sentencing guideline for Defendant's violation of 18 U.S.C. § 1201(a) and (g)(1)(A) is USSG §2A4.1. *See* USSG App. A. The parties agreed that Defendant's base offense level was **32**. *See* USSG §2A4.1(a) (stating a defendant's base offense level is 32 if he is convicted of kidnapping, abduction or unlawful restraint). The parties also agreed that a **one**-level upward adjustment was warranted pursuant to USSG §2A4.1(b)(4)(B) because the victim was not released before seven days had lapsed, and a **six**-level upward adjustment was warranted pursuant to USSG §2A4.1(b)(5) because Defendant sexually exploited the victim.

The parties also agreed that the cross-reference at USSG §2A4.1(b)(7)(A) is applicable. The cross-reference requires application of USSG §2A3.1—the guideline section for "Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse." Under USSG §2A3.1, the parties agreed (1) that Defendant's base offense level is **30**; (2) that a **two**-level upward adjustment is warranted pursuant to USSG §2A3.1(b)(2)(B), because the victim "had attained the age of twelve years but had not attained the age of sixteen years";

7

and (3) that a **four**-level upward adjustment was warranted pursuant to USSG §2A3.1(b)(5), because the victim was abducted.

At the Hearing, the court held that the agreed-upon adjustments were appropriate and made corresponding factual findings. The court noted that, in the Plea Agreement, Defendant stipulated to a factual basis for the upward adjustments. This brought Defendant's adjusted offense level under USSG §2A4.1 to **39** and his cross-reference offense level under USSG §2A3.1 to **36**.

The parties also agreed that Defendant qualified for a **three**-level reduction pursuant to USSG §3E1.1(a) and (b), that is, the acceptance of responsibility guideline.

## B. Disputed Issues

The parties disagree as to the following sentencing issues: (1) whether Defendant's offense level should be increased by four levels pursuant to USSG §2A3.1(b)(1) for the use of force in kidnapping M.B.; (2) whether upward adjustments under both USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5) constitutes impermissible double counting; (3) whether a downward departure is warranted due to Defendant's criminal history or his abusive relationship with his father; and (4) the ultimate term of imprisonment. The court shall address each issue in turn.

### 1. USSG §2A3.1(b)(1) and use of force

The first disputed issue the court decided in calculating Defendant's advisory Sentencing Guidelines range was whether Defendant was subject to a four-level increase pursuant to USSG §2A3.1(b)(1) for the use of force in kidnapping M.B. Section 2A3.1(b)(1) provides: "If the offense involved conduct described in 18 U.S.C. § 2241(a) or (b), increase by **4** levels." USSG §2A3.1(b)(1) (emphasis in original). Section 2241(a) and (b) provide the following:

(a)  By force or threat.—*Whoever*, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the Attorney General *knowingly causes another person to engage in a sexual act—*

    (1)  *by using force against that other person*; or

    (2)  *by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping*;

    *or attempts to do so*, shall be fined under this title, imprisoned for any term of years or life, or both.

(b)  By other means.—Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the Attorney General knowingly—

    (1)  renders another person unconscious and thereby engages in a sexual act with that other person; or

    (2)  administers to another person by force or threat of force, or without the knowledge or permission of that person, a drug, intoxicant, or other similar substance and thereby—

        (A)  substantially impairs the ability of that other person to appraise or control conduct; and

        (B)  engages in a sexual act with that other person;

> or attempts to do so, shall be fined under this title,
> imprisoned for any term of years or life, or both.

18 U.S.C. § 2241 (emphasis added). The Eighth Circuit Court of Appeals "has held repeatedly that the same amount of force that will sustain a conviction under 18 U.S.C. § 2241(a) will also sustain the application of the four-level enhancement under USSG §2A3.1(b)(1)." *United States v. Bordeaux*, 997 F.2d 419, 420 (8th Cir. 1993). The Sentencing Guidelines provide further guidance as to the applicability of USSG §2A3.1(b)(1):

> For purposes of subsection (b)(1), "conduct described in 18 U.S.C. § 2241(a) or (b)" is engaging in, or causing another person to engage in, a sexual act with another person by: (A) using force against the victim; (B) threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping; (C) rendering the victim unconscious; or (D) administering by force or threat of force, or without the knowledge or permission of the victim, a drug, intoxicant, or other similar substance and thereby substantially impairing the ability of the victim to appraise or control conduct. This provision would apply, for example, if any dangerous weapon was used or brandished, or in a case in which the ability of the victim to appraise or control conduct was substantially impaired by drugs or alcohol.

USSG §2A3.1, comment. (n.2). "The Government can show criminal sexual abuse by proving force sufficient to overcome, restrain, or injure a person; or the use of a threat of harm sufficient to coerce or compel submission by the victim." *United States v. Searby*, 439 F.3d 961, 963 (8th Cir. 2006) (quotations omitted); *see id.* (discussing USSG §2A3.2(c)'s cross-reference to §2A3.1). If "the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact," then the force requirement is met. *Id.* (quotations omitted). *But see United*

*States v. Blue*, 255 F.3d 609, 613 (8th Cir. 2001) (explaining that "size difference [between the defendant and the victim] alone cannot establish use of force under section 2A3.1(b)(1)").

Here, the court found that Defendant's offense involved conduct described in 18 U.S.C. § 2241(a)(2). That is, the court found that Defendant caused M.B. to engage in sexual acts by using force and by threatening her with serious bodily injury or kidnapping. *See* USSG §2A3.1, comment. (n.2). Although Defendant denied M.B.'s statement that he threatened to kill her and her family, he has admitted several threatening statements. "'A sentencing court may accept the facts in a PSR as true unless the defendant objects to specific factual allegations.'" *United States v. Wintermute*, 443 F.3d 993, 1005 (8th Cir. 2006) (quoting *United States v. Sorrells*, 432 F.3d 836, 838 (8th Cir. 2005)); *see United States v. Poor Bear*, 359 F.3d 1038, 1042 (8th Cir. 2004) (explaining that "when the defendant makes a timely objection to the PSR, if the sentencing court chooses to make a finding with respect to the disputed facts, it must do so on the basis of evidence, and not the presentence report" (quotations omitted)). Here, Defendant admits that, when he met M.B., "he told her that she was going with him" and that Defendant told M.B. that he "owned" her. (PSIR ¶ 17; docket no. 39, at ¶ 29(A)). Defendant bartered M.B. like he owned her without any regard for her wishes—he traded her sexual services for a discount on the bill from the Minneapolis mechanic. (PSIR ¶ 18; docket no. 39, at ¶ 29(B)). Likewise, Defendant accepted $20 from his friend, Freeman, in exchange for M.B.'s oral sex and Defendant twice gave his "consent" for M.B. to perform oral sex on Freeman. (docket no. 39, at ¶ 29(D) and (F)). Defendant admitted that he "physically slapped M.B., intimidating and frightening her," (*id*. at ¶ 29(C)), and took her from Minnesota to Iowa "against her will and out of fear and intimidation," (*id*. at ¶ 29(D)).

M.B.'s victim impact statement also tells of the force that Defendant used on M.B. while he held her captive. M.B. states that she "had injuries from [Defendant's] beatings, like bruises, scars, indents and scratches. My throat hurt for a very long time. I am afraid I will never be able to have normal sex again." (PSIR ¶ 31(C)). Defendant did not object to this statement in the PSIR, so the court accepted it as true. *See Wintermute*, 443 F.3d at 1005. Moreover, M.B. describes having "flashbacks" to the time she was kidnapped and M.B. lives in fear. (PSIR ¶ 31(A) & (B)). She stated: "When I came home, I cried every day and night. I am so afraid that people I meet will think I have a disease. I am afraid that people will think they can do that to me again." (PSIR ¶ 31(B)). The fact that M.B. continued to be afraid following her release is a factor showing the offense was committed by the threat or use of force. *See United States v. Knife*, 9 F.3d 705, 706-07 (8th Cir. 1993) (analyzing 18 U.S.C. § 2241(a) and finding the defendant used force on his child victim where, among other things, the victim felt defendant's presence was physically threatening and she continued to fear him after she left his home).

Additionally, the court found that Defendant threatened to prolong the abduction of M.B. if she did not continue to engage in sex acts with Defendant and strangers she met during the time she was kidnapped between March 17, 2005, and March 27, 2005. *See* USSG §2A3.1, comment. (n.2(B)); *United States v. LaRoche*, 83 F.3d 958, 959 (8th Cir. 1996) (affirming a §2A3.1(b)(1) enhancement where the defendant "forced the victim to perform various sexual acts," "threatened [the victim] with retaliation if she told anyone about the abuse," and "the victim feared retaliation"). Defendant continually intimidated and threatened M.B. to keep her in her subservient position as a kidnap victim and sex slave. Defendant was twenty-five-years-old and M.B. was thirteen-years-old. *See United States v. Balfany*, 965 F.2d 575, 584 (8th Cir. 1992) (explaining that the defendant's threat of harm "must be examined in context" and the fact that an adult made the threat to an

eight-year-old girl made it even more reasonable to conclude that it was a threat of serious bodily injury). Defendant's domination over the teenaged M.B. was a threat of force. From the time he met M.B. in Minneapolis, he constantly reminded her that he "owned" her and that she could not escape his control. Defendant drove M.B. hundreds of miles from her home in Minneapolis, away from everything and everyone that she knew, forced her to engage in sex acts with him, forced her to engage in sex acts with others—men and at least one woman, and generally treated her like a sex slave. Defendant also physically abused M.B. He slapped her and left "bruises, scars, indents and scratches" on her body. *Searby*, 439 F.3d at 963-64 (explaining that the force element of §2A3.1 was met in a case involving rape where a thirty-eight-year-old defendant grabbed a fourteen-year-old victim by the arm and took her to the bedroom, laid on top of her while she "told him to stop about eight or nine times," and where the defendant hit the victim on the back of the head with a beer bottle as she was trying to fight him off).

Accordingly, the court held a **four**-level increase pursuant to USSG §2A3.1(b)(1) was warranted due to Defendant's use of force and threatened force. As such, the adjusted offense level under USSG §2A3.1 was **40** and the adjusted offense level under USSG §2A4.1 was **39**. Pursuant to USSG §2A4.1(b)(7)(A), the court must apply the greater of the two adjusted offense levels. Thus, the court concluded Defendant's adjusted offense level was **40**.[3]

---

[3] After finding the adjusted offense level, the court then applied the **three**-level reduction for acceptance of responsibility pursuant to USSG §3E1.1 and Defendant's total offense level became **37**.

## 2. *Application of both USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5) does not constitute impermissible double counting*

The second disputed issue the court decided in calculating Defendant's advisory Sentencing Guidelines range was whether application of USSG §2A3.1(b)(1)'s use of force adjustment and USSG §2A3.1(b)(5)'s abduction adjustment constituted impermissible double counting.

Defendant acknowledges that the Eighth Circuit Court of Appeals' opinion in *United States v. Brown*, 330 F.3d 1073 (8th Cir. 2003), which held that application of the two guideline subsections did not constitute impermissible double counting. Instead, Defendant makes an as-applied challenge by arguing that, in Defendant's case, the two subsections do not address "conceptually separate notions relating to sentencing," *id*. at 1079, and the application of both, therefore, constitutes impermissible double counting. The government responds that *Brown* is controlling and that Defendant's case is exactly the reason why the Sentencing Commission formulated two separate enhancements.

In *Brown*, the defendant was convicted of kidnaping and aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1201(a)(1) and 2241(c). *Id*. at 1076. The court enhanced the defendant's sentence under both USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5), and the defendant argued that it was impermissible double counting. *Id*. at 1079. The Eighth Circuit Court of Appeals rejected his argument and stated: "Double counting is permissible when the Sentencing Commission intended that two provisions both apply and they address 'conceptually separate notions relating to sentencing.'" *Id*. (quoting *United States v. Rohwedder*, 243 F.3d 423, 427 (8th Cir. 2001)). The *Brown* court also noted that it had upheld the imposition of both enhancements in a previous case where a victim was abducted and forcibly raped. *Id*. (citing *United States v. Saknikent*, 30 F.3d 1012, 1013 (8th Cir. 1994)).

The court found that the application of USSG §2A3.1(b)(1) and USSG §2A3.1(b)(5) does not constitute impermissible double counting in Defendant's case. Here, M.B. was both abducted from Minnesota and forcibly sexually assaulted by Defendant numerous times during a period lasting more than a week. Defendant abducted M.B. on March 17, 2005, when he told her that she was going with him. This conduct is punished by USSG §2A3.1(b)(5). Defendant sexually assaulted her on that day and continued to do so during through March 27, 2005. He used force and threats of force throughout this entire time period. *See supra* at Part V(B)(1). That conduct is penalized by USSG §2A3.1(b)(1). Therefore, the court found that, in Defendant's case, the two guideline subsections "address conceptually separate notions relating to sentencing." *Brown*, 330 F.3d at 1079 (quotation omitted).

### 3.     *Defendant's motions for downward departure*

The third disputed issue the court decided at the Hearing was whether Defendant was entitled to a downward departure due to overstated criminal history or his abusive relationship with his father.

### a.     *Downward departures are disfavored*

USSG §5K2.0(b) provides guidance for assessing whether downward departures from the advisory guidelines range are warranted in cases involving "sexual offenses." *Id.* §5K2.0(b). Section 5K2.0(b) provides:

> (b) Downward Departures in Child Crimes and Sexual Offenses.—Under 18 U.S.C. 3553(b)(2)(A)(ii), the sentencing court may impose a sentence below the range established by the applicable guidelines only if the court finds that there exists a mitigating circumstance of a kind, or to a degree, that—
>
> > (1) Has been affirmatively and specifically identified as a permissible ground of downward departure in the

> sentencing guidelines or policy statements issued under section 994(a) of title 28, United States Code, taking account of any amendments to such sentencing guidelines or policy statements by act of Congress;
>
> (2) Has not adequately been taken into consideration by the Sentencing Commission in formulating the guidelines; and
>
> (3) Should result in a sentence different from that described.

> The grounds enumerated in this Part K of Chapter Five are the sole grounds that have been affirmatively and specifically identified as a permissible ground of downward departure in these sentencing guidelines and policy statements. Thus, notwithstanding any other reference to authority to depart downward elsewhere in this Sentencing Manual, a ground of downward departure has not been affirmatively and specifically identified as a permissible ground of downward departure within the meaning of section 3553(b)(2) unless it is expressly enumerated in this Part K as a ground upon which a downward departure may be granted.

USSG §5K2.0(b). In turn, 18 U.S.C. § 3553(b)(2)(A)[4] provides, in part:

> In sentencing a defendant convicted of an offense under [18 U.S.C. §] 1201 involving a minor victim . . . the court shall impose a sentence of the kind, *and within the range*, referred to in subsection (a)(4) unless—

> * * *

---

[4] The Prosecutorial Remedies and Other Tools to end the Exploitations of Children Today Act of 2003 (the PROTECT Act), Pub. L. No. 108-21, amended 18 U.S.C. § 3553(b)(2)(A).

> (ii) the court finds that there exists a mitigating circumstance of a kind or to a degree that—
>
>> (I) has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;
>>
>> (II) has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and
>>
>> (III) should result in a sentence different from that described . . . .

18 U.S.C. § 3553(b)(2)(A) (emphasis added). In other words, defendants who have committed sexual abuse of a child are within the class of defendants whom Congress determined would rarely be entitled to a downward departure. Defendant admits so much in his sentencing memo when he writes: "Guideline Section 5K2.0(b) sharply curtails the court's ability to depart downward in child crimes and sexual offenses . . . ." (docket no. 49-2, at 7).

Therefore, the court recognized it had limited authority to depart in Defendant's case due to his offense of conviction.

### b.    *Downward departure for overstated criminal history*

Defendant sought a downward departure for overstated criminal history pursuant to USSG §4A1.3. USSG §4A1.3 provides for downward departures generally:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the

> defendant will commit other crimes, a downward departure
> may be warranted.

USSG §4A1.3(b)(1). "A downward departure from the defendant's criminal history category may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." USSG §4A1.3, comment. (n.3).

For the reasons stated in Part V(C) herein, the court declined to depart downward due to Defendant's criminal history.

### c.    *Downward departure for abusive relationship with father*

Defendant moved for a downward departure pursuant to USSG §5H1.3. based upon his abusive relationship with his father. (*See* docket no. 49).

Section 5H1.3, in part, provides: "Mental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted . . . ." USSG §5H1.3, p.s.; *see also United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005) (quoting USSG §5H1.3 and explaining that "Section 5H1.3 expressly disfavors departures based upon mental and emotional conditions by stating that such conditions are not 'ordinarily relevant'"). Therefore, "[t]his ground for departure [is] not appropriate unless [Defendant's] mental condition [is] 'present to an unusual degree.'" *United States v. Roberts*, 313 F.3d 1050, 1055 (8th Cir. 2002) (citing USSG § 5K2.0 and *Koon v. United States*, 518 U.S. 81, 96 (1996), which explains that some departure factors are discouraged factors).

Despite the fact that departures for mental and emotional conditions are disfavored and the fact that §5K2.0(b) curtails the court's ability to grant any departure in Defendant's case, Defendant argues that the physical and emotional abuse he suffered as a child at the hands of his father warrants a departure. Defendant describes his father as "a life-long

criminal and manipulator" who encouraged Defendant to engage in sexual exploitation for personal gain. (docket no. 49-2, at 8).

At the Hearing, Defendant and his mother testified regarding Defendant's relationship with his father. They testified that Defendant endured physical abuse, including sexual abuse, at the hands of his father, Robert Salis, Sr. They testified that Salis psychologically harmed Defendant and Defendant has spent his whole life trying to please his father.

The court found that Defendant's history of abuse, while unfortunate, is fairly common among federal criminal defendants. There was nothing about how Defendant's father treated him that took Defendant's case outside the heartland of cases. *Koon*, 518 U.S. at 95-96. Moreover, USSG §5K2.0(b) curtails the court's ability to depart downward in Defendant's case, because he pled guilty to sexually abusing a minor. Likewise, USSG §5H1.3 explains that these factors are "not ordinarily relevant." USSG §5H1.3. For these reasons, the court acknowledges that it has a limited authority to depart downward but declines to do so.

### 4.    *Section 3553(a) factors*

The court next considered the factors in 18 U.S.C. § 3553(a) and determined the appropriate term of imprisonment. In arriving at the reasonable sentence, the court assessed each of the factors in 18 U.S.C. § 3553(a). It was mindful that the sentence should be "sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." *Id.* § 3553(a). The court assessed, among other things, the facts and circumstances of Defendant's case and his history and characteristics.

The court considered the seriousness of Defendant's criminal history. Defendant's criminal history includes three crimes of violence: assault in the second degree in 1999, burglary (involving a sexual assault) in 1999 and assault in the third degree in 2004. *See*

USSG §4B1.2, comment. (n.1) (defining "crime of violence" as including crimes which involve "the use, attempted use, or threatened use of physical force against the person of another"). Two of Defendant's prior convictions involve threatening others: his 2000 conviction for tampering with a witness or juror and his 2004 conviction for Trespass-Return to Property-To Harass/Abuse/Threat.

Many of Defendant's prior acts were extremely violent and threatening, yet he has received extremely lenient sentences. The PSIR indicates that Defendant's "Tampering with a Witness or Juror" conviction included him threatening a witness "in a drug investigation by indicating that if the witness spoke to the police he would 'put a bullet in her head.'" (PSIR ¶ 54). Defendant and other members of his street gang assaulted a person in 1998 "through the use of a fire extinguisher, television set, bottles, furniture, a vacuum cleaner, and a radio." (*Id.* ¶ 55). Defendant held a handgun while he "punched and kicked the victim." (*Id.*). The victim's injuries were so severe that he underwent a blood transfusion and surgery to repair nerve damage, and the victim suffered from headaches and paralysis of his right hand following the assault. (*Id.*). On October 6, 1999, Defendant was sentenced to a term of forty-four months' imprisonment, but he did not serve the entire sentence, because he committed his next crime about twenty-eight months later, on February 5, 2002. (*See* PSIR ¶¶ 55 & 62).

Defendant's 1999 burglary conviction was, perhaps, his most violent prior conviction. Once again, he and his fellow street gang members forced their way into a rival gang member's residence and brutally attacked the rival gang member's girlfriend, A.T. (*Id.* ¶¶ 58-59). Defendant and his gang carried a steel pole and a .22 caliber handgun. (*Id.* ¶ 59). The PSIR provides the details of Defendant's rabid assault:

> After [Defendant and the other gang members] entered the residence, [Defendant] grabbed A.T. and stated he was going

> [to] 'fuck and rape' her. He also stated that they were going
> to kill [the rival gang member]. One of the other gang
> members suggested that they 'get the bitch first' and then kill
> [the rival gang member]. [Defendant] and his companions
> began to beat A.T. with the steel pole and a bamboo pole as
> they kicked A.T.'s body. After one of the gang members
> brandished a handgun and kicked A.T.'s stomach, the entire
> group forced A.T. into an upstairs bedroom. While in the
> bedroom, [Defendant] squirted toothpaste on A.T.'s head. He
> and his companions then laughed and ridiculed A.T. While
> [Defendant] continued to hit A.T., he told her to remove her
> pants. [Defendant] then placed his penis in A.T.'s mouth and
> ordered her to suck his penis. When the telephone rang,
> [Defendant] removed his penis from A.T.'s mouth. Another
> gang member then placed his penis inside A.T.'s mouth and
> ejaculated in her mouth.

> The Complaint states that during the assault of A.T., [the rival
> gang member] dialed '911' and reported the incident. . . .
> [When officers arrived,] they located A.T. lying on the floor
> in a bathroom. She was crying an[d] shaking while lying in a
> fetal position. A.T. was then transported to a local hospital to
> have her injuries treated.

(PSIR ¶¶ 59-60). Defendant was in no way deterred by the seven years of probation that
was imposed upon him. (PSIR ¶ 58). During Defendant's 2004 assault, Defendant
similarly beat and threatened his victim:

> [Defendant] forced the victim out of the room, punched her
> face, threw her on a bed, and repeatedly punched the victim's
> face. Each time the victim attempted to dial '911,'
> [Defendant] ripped the telephone from the victim's hands.
> [Defendant] also told the victim that he 'would have her killed'
> if she contacted the police.

(PSIR ¶ 65).

The court found that Defendant has an extremely high risk of recidivism. Defendant has committed crimes constantly since he was seventeen-years-old; he has been convicted eleven times since 1999. Defendant was on probation for his 1999 burglary conviction and his 2004 assault conviction when he committed the instant offense. Defendant also committed the instant offense less than two years after being released from prison for the 2004 assault conviction. Defendant's complete inability to refrain from criminal conduct is demonstrated by his actions in the prison context. While incarcerated for the violent 1999 assault conviction, Defendant was involved in a fight with a member of the Aryan Nation prison gang. (PSIR ¶ 57). While pending sentencing in the instant case, defendant beat a fellow inmate at the Linn County Correctional Facility. (PSIR ¶ 73A). He has shown no desire to rehabilitate himself or participate in treatment programs that have been available to him. While in prison for the 1999 assault, Defendant failed to participate in sex offender treatment. (PSIR ¶ 57). He also failed to register as a sex offender in 2005. (PSIR ¶ 68).

Defendant has been treated with leniency in the past. On October 6, 1999, Defendant was given a forty-four month term of imprisonment for the violent assault he committed when he was eighteen-years-old. (PSIR ¶ 55). Also on October 6, 1999, Defendant was sentenced for the 1999 burglary and received a term of seven years probation. (PSIR ¶ 58). Moreover, three additional counts charging Sexual Abuse in the First Degree and one count charging Defendant with Terroristic Threats were dismissed, apparently in exchange for the paltry sentence of probation for his brutal gang rape and beating of A.T. (PSIR ¶ 61). Defendant also received a lenient sentence for the assault he committed when he was twenty-four-years-old in 2004. (PSIR ¶ 65). For that violent

assault, Defendant served 207 days (or about seven months) in jail and was given a five-year term of probation. (*Id.*). The court found that Defendant's lenient past sentences have not been effective in curbing his appetite for violence.

Defendant's criminal history demonstrates a "proclivity for recidivism." *See United States v. Lara-Banda*, 972 F.2d 958, 959 (8th Cir. 1992). Indeed, incarceration is the only thing that seems to keep Defendant from committing additional crimes. *See United States v. Washington*, 109 F.3d 459, 462 (8th Cir. 1997) (commenting that "[i]t would seem that only incarceration kept [the defendant's] criminal history as low as category IV.). Defendant is an "'unrepentant, incorrigible, recidivist, who poses a significant threat to the safety of the community.'" *United States v. Aguilar-Lopez*, 329 F.3d 960, 963 (8th Cir. 2003) (quoting *Lara-Banda*, 972 F.2d at 960)).

Here, M.B. endured repeated sexual assaults by Defendant and the others that he loaned her and sold her to over a ten-day period. He kept her as his sex slave during that time. But for the fact that Defendant abducted M.B., she would have never been left with Defendant's father, Robert Salis, Sr., and she would not have been employed by Salis and Betty Thompson as a prostitute for an additional period of time. The court found that Defendant's actions inflicted severe psychological and physical harm upon M.B. Because of the abduction and the way Defendant treated her, M.B. no longer has any self-esteem, she lives in fear and has flashbacks to her time in Iowa, and she does not feel that she will ever "fit in" with her peers. The physical abuse was also extreme and there were lasting physical effects after the ordeal had ended. Defendant did not allow M.B. to shower during the time he held her against her will; she became infected with trichomoniasis; she had "bruises, scars, indents, and scratches" from Defendant's abuse; her "throat hurt for a very long time"; she had "a lot of soreness and pain in [her] throat and butt"; and she did not receive medical attention for her pain. (*See* PSIR ¶¶ 31-33).

In sum, Defendant's conduct in the instant offense was extreme. Defendant is an unrepentant and violent recidivist who is an extreme danger to the community and who is prone to extreme behavior. He is a member of a street gang which engaged in violent behavior and sold drugs. He has a history of abusing drugs and alcohol. He has not held a job for most of his adult life.

After considering all of the factors in 18 U.S.C. § 3553(a), the court concluded that the appropriate sentence was a life sentence.

### 5. *"Life" is equivalent to 470 months*

Finally, the court determined the definition of "life." In Defendant's case, the government made a motion for downward departure pursuant to USSG §5K1.1 for substantial assistance and the court granted the motion. The court had to overcome the indeterminancy of a "life" sentence in order to grant a departure from it.

Judge Posner has written the following regarding life sentences:

> Life expectancy at any given age is the average number of years remaining to be lived by those surviving to that age on the basis of a given set of age-specific rates of dying. . . . [L]ife expectancy is an estimate merely of how long the *average* person of a given age, nationality, and sex . . . is expected to live. Roughly half . . . will die earlier. By the same token, roughly half will survive. This shows that even a sentence equal to . . . a person's life expectancy is less severe than a life sentence.

*United States v. Prevatte*, 66 F.3d 840, 847 (7th Cir. 1995) (Posner, C.J., concurring) (citations and quotations omitted) (emphasis in original). The court notes that, according to the National Center for Health Statistics's 2003 life expectancy table, Defendant, a

twenty-seven-year-old black man, is expected to live approximately 44 more years.[5] *See* National Vital Statistics Reports, Vol. 54, No. 14, at p. 3 (Apr. 19, 2006), *available at* http://www.cdc.gov/nchs.

The United States Sentencing Commission defines a federal guideline sentence of "life" as 470 months. *See United States Sentencing Commission's 2005 Sourcebook of Federal Sentencing Statistics*, Appendix A (Post-*Booker*): Descriptions of Datafiles, Variables, and Footnotes [hereinafter "*2005 Sourcebook*"], *available at* http://www.ussc.gov/ANNRPT/2005/SBTOC05.htm (last visited Sept. 14, 2006) ("However, to reflect life expectancy of federal criminal defendants more precisely and to provide more accurate length of imprisonment information, life sentences are now defined as 470 months."); *see also United States v. Keller*, 413 F.3d 706, 711 (8th Cir.) (affirming district court's definition of "life" as 470 months for the purposes of having a "starting point" for a substantial assistance reduction), *cert. denied*, 126 S. Ct. 786 (2005). Prior to 1993, the Commission defined "life" as 360 months. *2005 Sourcebook*.

The Bureau of Prisons defines "life" as 540 months, or 45 years. *See* Security Designation and Custody Classification Manual, PS 5100.07, Ch. 9, p. 6. at Table 9-3 (Sept. 3, 1999), *available at* http://www.bop.gov/policy/progstat/5100_007.pdf (instructing that when an inmate has been sentenced to life imprisonment, "540 is entered as the expected number of months to serve").

Next, the court considers the terms of imprisonment provided in the Controlled Substances Act, 21 U.S.C. § 841 *et seq*. Section 841 provides a punishment scheme for

---

[5] The life expectancy for a twenty-five-year old black man is an additional 46.3 years and the life expectancy for a thirty-year-old black man is an additional 41.8 years. National Vital Statistics Reports, Vol. 54, No. 14, at p. 3 (Apr. 19, 2006), *available at* http://www.cdc.gov/nchs.

various drug trafficking offenses. The penalty provisions include terms of imprisonment which increase in accordance with the quantity of drugs involved in the crime. Offenders who are involved with relatively small amounts of controlled substances are penalized pursuant to Section 841(b)(1)(C), which provides for imprisonment for a term of "up to 20 years." 21 U.S.C. § 841(b)(1)(C). An offense which is punishable under Section 841(b)(1)(B) earns an offender a term of imprisonment of at least five years and not more than forty years. *Id.* § 841(b)(1)(B). If an individual is penalized pursuant to Section 841(b)(1)(A), the offender receives a term of imprisonment "which may not be less than 10 years or more than life . . . ." *Id.* § 841(b)(1)(A). In fashioning this incremental punishment scheme, it seems that Congress envisioned a "life" sentence under Section 841(b)(1)(A) to be greater than the maximum term of imprisonment which can be imposed under Section 841(b)(1)(B), that is, 40 years or 480 months.

Most recently, the Eighth Circuit Court of Appeals affirmed a sentence in which the district court defined life as 405 months. In the unpublished case of *United States v. Selby*, No. 05-1718, 2006 WL 1667650 (8th Cir. June 19, 2006), the Eighth Circuit Court of Appeals upheld a sentence where the court granted a substantial assistance departure after determining that "life" was equivalent to 405 months. *Id.* at *1. The Eighth Circuit Court of Appeals noted that the defendant "actually received a favorable starting point of 405 months" because the Commission defines life sentences as 470 months. *Id.* (citing *United States Sentencing Commission's 2004 Sourcebook of Federal Sentencing Statistics*, Appendix A, and *Keller*, 413 F.3d at 711).

The court considered these and other definitions of "life imprisonment." A term of 470 months is the appropriate definition of life imprisonment in Defendant's case.

## VI. CONCLUSION

The court found that a **four**-level upward adjustment was warranted pursuant to USSG §2A3.1(b)(1). Therefore, under USSG §2A4.1(b)(7)(A)'s cross reference, the adjusted guideline level from USSG §2A3.1 was used rather than the level from USSG §2A4.1, because the USSG §2A3.1 level was higher at level **40**. Accordingly, Defendant's adjusted offense level was **40** and the court found he was entitled to a **three**-level downward adjustment for acceptance of responsibility under USSG §3E1.1. Defendant's total offense level was **37**, his Criminal History Category was VI, and his advisory sentencing guideline range was 360 months to life imprisonment. The court denied Defendant's motions for downward departure due to overstated criminal history and due to his abusive relationship with his father. It considered the factors in 18 U.S.C. § 3553(a) and found that a life sentence was appropriate. It found that "life" meant 470 months in Defendant's case. The court granted the government's substantial assistance motion and departed ten percent from the top of the advisory sentencing guideline range. The court sentenced Defendant within the advisory sentencing guideline range and to a term of imprisonment of 423 months' imprisonment.

**IT IS SO ORDERED.**

**DATED** this 18th day of September, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

27